IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RAYMOND SHANER,** | ) |
| Plaintiff, | ) |
| v. | ) 2:07cv0931 |
| | ) **Electronic Filing** |
| **MICHAEL J. ASTRUE,** | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

August 21, 2008

## I.   INTRODUCTION

Plaintiff, Raymond Shaner, ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). The parties have filed cross-motions for summary judgment, and the record has been developed at the administrative proceedings.

## II.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on November 13, 2003, alleging disability since June 19, 2003, due to misalignment of his feet (foot and toe pain). On April 14, 2004, Plaintiff timely requested a hearing after his initial claim was denied. On February 7, 2005, Plaintiff appeared with counsel, before Administrative Law Judge ("ALJ"), Douglas W. Abruzzo, and both Plaintiff and vocational expert, Eugene Hoffman ("VE Hoffman") testified. A second vocational expert, Mark Heckman ("VE Heckman") was questioned through interrogatories on December 9, 2005 and February 13, 2006.

On June 29, 2006, the ALJ denied Plaintiff's claim under the five-step sequential analysis used to determine disability. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since alleging disability on June 19, 2003. Although Plaintiff had

made three attempts to return to work (in August, October, and November 2003, respectively), these attempts lasted at least a day and no more than one month. R. 21.[1] Consequently, the ALJ classified these attempts as unsuccessful and were not considered to be substantial gainful activity. *Id.* The ALJ determined at step two that Plaintiff had the following severe impairments: obesity and bilateral foot pain, secondary to failed surgeries. At step three, the ALJ determined that Plaintiff's impairments did not meet any of the criteria set forth in 20 C.F.R. §§ 404, Subpart P, Appendix 1, Regulation No. 4. The ALJ concluded, at step four, that Plaintiff is unable to perform the duties of his past work as a maintenance worker, an auto mechanic, and a boiler operator. R. 26. At step five, the ALJ determined that Plaintiff has the residual functional capacity (RFC) to perform work at the light exertional level requiring the lifting and/or carrying of no more than ten pounds frequently and twenty (20) pounds occasionally, standing and/or walking four hours in an eight-hour workday and some pushing and/or pulling of arm or leg controls. R. 22.

After the denial, Plaintiff requested a review of the ALJ's decision which the Appeals Council denied on September 14, 2006, thus becoming the final decision of the Commissioner. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Plaintiff then filed his complaint herein seeking judicial review of the Commissioner's final decision. The matter is now before this Court on the cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

### III. STATEMENT OF THE CASE

Plaintiff was born on August 3, 1947, was 58 years old at the time of the hearing, and considered to be of advanced age.[2] R. 24, 231, 232, 258. He obtained a high school equivalency diploma and training for a commercial driver's license. R. 144. From June 1984 to May 1990, Plaintiff worked as a mechanic/service station attendant. R. 107, 124-125, 151, and 258.

---

[1]R. refers to the administrative transcript.

[2]The ALJ stated that he was going to consider Plaintiff to be 58 years old since he was about to turn 58 years old. Plaintiff was, however, 57 years old at the time of the hearing. R. 258.

2

Beginning in May 1990, Plaintiff worked in the maintenance department of a hospital until September 2002. *Id.* He also provided security at the hospital.[3] R. 258. The following month, Plaintiff started working as a boiler operator and stayed in that position until June 2003. *Id.* In August 2003, Plaintiff attempted to work for one day, as a driver. *Id.*, 117, 124-125. In October 2003, Plaintiff again attempted to work as a laborer, also for one day. *Id.*, 116, 124-125. Plaintiff made his last attempt to work in November 2003 for about fourteen days, as a truck driver. *Id.*

The Court notes that Plaintiff's medical records are sparse as he does not have any insurance and lacks the finances to pay for treatment. R. 23, 145, 148. Plaintiff has stated that his foot and toe pain began in 1990, thirteen years before his alleged onset of disability. R. 136. He has been seeing podiatrist, Dr. John A. Marty ("Marty") since September 1999. R. 240. Dr. Marty diagnosed Plaintiff with osteoarthritis of the feet and legs, malalignment of the metatarsal, instability, and plantar fasciitis. R. 191.

On February 13, 2004, Plaintiff was examined by consultative examiner, Dr. Lloyd Richless ("Richless"). Dr. Richless observed that Plaintiff had a normal gait and station, had no difficulties with weight-bearing or ambulation, and did not require the use of any assistive devices. R. 164. Plaintiff did have difficulty standing on his toes and was not able to walk on his toes. *Id.* He was able to balance on his heels. *Id.* Dr. Richless noted that Plaintiff had decreased sensation to light touch although he was able to squat without significant difficulty. *Id.* Plaintiff did not have any motor atrophy present in his feet nor were there any signs of joint deformities. *Id.* Dr. Richless assessed Plaintiff as having chronic bilateral foot pain, obesity, and deconditioning. R. 165. He recommended an Electromyography exam, in order to check for

---

[3]Although Plaintiff's work as a maintenance person also required him to function as a low-level security guard, the two functions have been separated into two separate capabilities. R. 21-28, 228-276. Accordingly, the position of maintenance worker was found to be at the medium-exertional level while that of the security guard was at the light-exertional level. R. 26. The same reasoning was applied to the position of auto mechanic which was deemed to be at the medium-exertional level and that of service station attendant, which was at the light-exertional level. *Id.*

peripheral neuropathy. *Id.* He felt that Plaintiff's sensory loss might be attributable to the peripheral neuropathy. *Id.* Dr. Richless opined that Plaintiff had no limitations with sitting or pushing and/or pulling. R. 167. Plaintiff could occasionally bend, kneel, stoop, and crouch. R. 166. Plaintiff could never balance. *Id.* Plaintiff could frequently lift and/or carry between two and ten pounds and occasionally twenty pounds, stand and/or walk for more than two hours but less than six hours. R. 167.

On February 23, 2005, Dr. Marty completed an Employability Assessment Form for the Pennsylvania Department of Public Welfare ("PA DPW") stating that Plaintiff is "unable to work because of pain in feet and toes." R. 185. Dr. Marty also noted that Plaintiff was permanently disabled which precluded him from engaging in any gainful employment. R. 186. Again, on March 15, 2005, Dr. Marty observed that Plaintiff's "feet were disabled" but also indicated that Plaintiff's noncompliance with prescribed procedures and failure to follow-up post-surgery, played a role in hampering the healing process. R. 188, 239. Dr. Marty also stated that Plaintiff was experiencing difficulty in ambulating when using shoes and noted that future surgical reconstruction was possible but will not return Plaintiff's feet to their pre-injury state. *Id.*, 253, 254.

At the behest of consultative examiner, Dr. Richless, an EMG/MCV (Electromyography/Mean Cell Volume) study was conducted in April 2005 and showed that Plaintiff had "moderately severe peripheral polyneuropathy" indicating circulatory deterioration. R. 182-184. The EMG/MCV study also revealed that Plaintiff's other extremity parameters showed no abnormalities and were within normal limits. R. 184. Plaintiff was again examined by Dr. Richless on April 21, 2005. Dr. Richless reviewed Plaintiff's EMG/MCV study and confirmed his previous postulation of a moderately severe state of peripheral polyneuropathy and stated that this condition was indicative of "diabetes or other conditions which can cause peripheral neuropathy such as alcoholism, [and] familial acquired conditions." R. 178. Dr. Richless noted that Plaintiff "had no significant interval changes in his medical history since his evaluation" in February 13, 2004. R. 180. In June 2005, MRI (Magnetic Resonance Imaging) results showed the existence of some minimal thickening of the dermis in Plaintiff's left foot

4

which was possibly due to scarring or granulomatous (inflammatory) reaction. R. 190.

On June 17, 2005, Plaintiff presented to Dr. Matthew J. Sabo ("Sabo"). Dr. Sabo evaluated Plaintiff and noted that he had tailor's bunion and "multiple lesions [on] the plantar aspect of the left foot." R. 198. Plaintiff also experienced numbness and tingling in the toe close to the tailor's bunion and pain on direct palpation of the dorsal lateral eminence of the tailor's bunion. *Id.* Plaintiff also saw Dr. Marty on June 17, 2005. *Id.* Plaintiff complained of pain in his heels. *Id.* He had trigger point Dupuytren's contractures (a painless thickening and contracture of tissue beneath the skin on the palm of the hand and fingers) on his hands with the lesions being about three centimeters in diameter at the mid-arch area.[4] *Id.* Dr. Marty recommended that Plaintiff try injection therapy in order to slow the inflammation and noted that the prognosis was good. *Id.*, 254. Plaintiff eventually received 0.5cc of both DepoMedrol® and Lidocaine® injections in his feet on June 27, 2005. R. 198.

Plaintiff presented to Dr. Marty on January 31, 2006 for an evaluation of the arthritis in his feet and legs. R. 197. Dr. Marty opined that Plaintiff had difficulty ambulating and was disabled due to arthritic changes. *Id.* Plaintiff continued to experience pain in his feet and legs when he met with Dr. Marty on February 23, 2006. *Id.* Dr. Marty observed that Plaintiff's ambulation was "poor, painful, and problematic" and his status had not changed. *Id.* Plaintiff had several corrective surgeries (beginning in 2002 including bilateral great toe bunionectomies, straightening of his great toe joint, and repair of his metatarsals) but the pain in his feet and legs persisted. R. 162, 177, 188, 197, 198. Plaintiff also had "malunion secondary to bunion surgery" and fixation. *Id.* He was placed on a pediatric regimen including nonsteroidal anti-inflammatories. *Id.* Dr. Marty noted that Plaintiff was a candidate for the use of narcotic analgesics to control the pain although there is no record of a follow-up for this regimen. *Id.* The record does show that Plaintiff's medication consists of over-the-counter medication, specifically Tylenol and Aleve. R. 245. On February 23, 2006, Dr. Marty stated that Plaintiff

---

[4]Definition of Dupuytren's contractures. MedlinePlus.
<http://www.nlm.nih.gov/medlineplus/ency/article/001233.htm>.

had tried returning to work with little success and noted the avoidance of the use of narcotic analgesics to treat Plaintiff's pain due to possible side-effects and Plaintiff's continual treatment of nonsteroidal anti-inflammatories. R. 197. Dr. Marty did mention the possible use of the narcotic analgesics in the near future if Plaintiff's pain became unbearable. *Id.* On March 9, 2006, Dr. Marty prepared a medical source statement in which he stated that Plaintiff was "incapable of even low stress jobs," could only sit for two or more hours, stand or walk for fifteen minutes, and walk less than one city block without resting. R. 191.

## IV. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents (her) from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. § 423(d)(1). A claimant is considered to be unable to engage in substantial gainful activity "only if (her) physical or mental impairment or impairments are of such severity that (she) is not only unable to do (her) previous work but cannot, considering age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To support his ultimate findings, an ALJ must do more than state factual conclusions. He must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). The ALJ must consider all medical evidence contained in the record and must provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority under 42 U.S.C. § 405(a), has developed a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determined whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimants age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

## V. DISCUSSION

Plaintiff essentially argues that the ALJ erred in his assessment of Plaintiff's RFC. He also asserts that the ALJ's finding that Plaintiff could perform a significant number of light-level jobs was based on erroneous vocational expert opinion. The Commissioner contends that the ALJ's decision should be affirmed as it is supported by substantial evidence. The Commissioner also argues that the ALJ correctly assessed Plaintiff's RFC and the corresponding hypothetical question did result in a significant number of jobs that Plaintiff could perform. In addressing the

parties' averments, the Court will begin by providing a summary of the ALJ's RFC determination and application of the corresponding hypothetical question.

1.  *Introduction*

The ALJ based his RFC finding on Plaintiff's subjective testimony, the medical evidence in the record, and Drs. Marty's and Richless' assessments. The ALJ accorded great weight to Dr. Richless' assessment, in part due to the fact that it was based on direct examination of Plaintiff and it was supported by the evidence of record. R. 23-25. Dr. Richless observed that Plaintiff had a normal gait and station with little difficulty with ambulation. R. 23. Dr. Richless also stated that Plaintiff was to squat and balance and walk on his feet. R. 24. Plaintiff could not stand or walk on his toes and experienced a decrease in the sensation in his feet. *Id.* Dr. Richless opined that Plaintiff was able to frequently lift and/or carry ten pounds and occasionally lift twenty-five (25) pounds. *Id.* Plaintiff could stand and/or walk up to four hours in an eight-hour day and occasionally perform postural maneuvers with the exception of climbing. *Id.*

The ALJ also considered Dr. Marty's assessment but accorded little weight to his opinion as the ALJ found his assessment to be "internally inconsistent." R. 25. The ALJ also found Plaintiff's subjective testimony not to be entirely credible when compared to his description of his daily activities and life style and the medical evidence of record. R. 23. The ALJ noted that although Dr. Marty was treating Plaintiff for recurrent malalignment of his metatarsals and plantar fasciitis of the feet and had confirmed that Plaintiff was unable to walk and had a poor range of motion in his toes, Plaintiff was only taking over-the-counter medication and Dr. Marty had refrained from prescribing any narcotic pain medication. *Id.* The ALJ also noted that Plaintiff's recurrent condition was in part due to Plaintiff's noncompliance with the prescribed regimen including the use of "[ ]appropriate shoe gear." R. 24. Initially, Plaintiff reported that he could mow the lawn in twenty minutes as his home had very little grass. R. 134. Plaintiff also stated that although his wife took out the trash, he "would not have any problem with that." *Id.* In his testimony during the hearing, Plaintiff stated that he could not cut any grass or use the lawn mower (in part, due to the fact that he does not have any grass). R. 249-250. He also does not take out the trash. *Id.* The ALJ noted that Plaintiff failed to provide an explanation for "the

significant decrease in his capabilities since he first filed for benefits." R. 24.

The ALJ determined that Plaintiff had the residual functional capacity:

> . . . that is limited to walking and/or standing four hours in an eight[-]hour work day; occasional crouching; avoids the use of ladders, ropes or scaffolds; affords a sit/stand/walk option that permits the claimant to take four or five steps away from his workstation, during a one minute period, up to five times an hour (for sedentary jobs only); avoids pushing and/or pulling with the lower extremities, including the operation of pedals, unless the pedals require the use of less than ten pounds of force to operate; avoids even moderate exposure to cold temperature extremes, extreme wetness or humidity; and does not involve exposure to dangerous machinery.

R. 22.

The ALJ also stated that Plaintiff could not perform any of his past relevant work. R. 26. He found that although Plaintiff's previous positions of a low-level security guard and gas station attendant were at the light-exertional level, Plaintiff could not perform these jobs as they required standing for more than four hours in an eight-hour work day. *Id.*

During the hearing, the ALJ asked VE Hoffman to consider a hypothetical claimant who is of advanced age, has a general education diploma, has past relevant work as an auto mechanic, a maintenance person, and low-level security guard, but is limited to light work and able to walk and stand, up to four hours per day, lift up to twenty pounds, have the option to sit, stand, and walk (no more than four or five steps from the workstation) during the work day, and perform a pain reduction maneuver (returning within one minute) no more than five times in an hour. R. 259-260. This hypothetical claimant is limited to the use of foot pedals, requiring no more than ten pounds of pressure to operate the pedals, cannot use ropes, ladders, or scaffolds, and avoid moderate exposure to cold temperature extremes and extreme wetness or humidity, essentially an inside job without exposure to dangerous machines. *Id.*

VE Hoffman classified Plaintiff's past work as light and medium. R. 258-259. He noted that Plaintiff would not be able to perform his previous medium-exertional level jobs, namely auto mechanic, maintenance person, and boiler operator. R. 258. He stated that such a claimant would be able to work as a cashier in a gas station (80,000 jobs available nationally), as an assembler (a position requiring the use of pliers, working aids, and other hand tools, of which there are 55 jobs available locally, 4,000 jobs state-wide, 200,000 jobs nationally), as a wire

9

worker or preparation worker (60 jobs locally, 3,000 jobs state-wide, 100,000 jobs nationally), and as a hand packager of small products (80 jobs locally, 2,000 jobs state-wide, 100,000 jobs nationally). R. 261-262. VE Hoffman also discussed sedentary jobs including that of a surveillance monitor ( 20 jobs locally, 800 jobs state-wide, 10,000 jobs nationally) and a rubber gasket cutter (20 jobs locally, 1,000 jobs state-wide, 100,000 jobs nationally). R. 263. None of the jobs would require the use of safety-toed shoes. *Id.*

The ALJ did not question VE Heckman at the hearing. Instead, VE Heckman's testimony was recorded in interrogatories on December 9, 2005 and February 13, 2006. R. 150-153, 156-158. The ALJ posed a hypothetical to VE Heckman that was identical to that given to VE Hoffman except he did not limit the stand/walk option to four hours in an eight-hour workday but limited Plaintiff to the light-exertional level. R. 152. In the December 9, 2005-interrogatory ("December interrogatory"), VE Heckman classified Plaintiff's past work as medium and heavy. R. 151. He opined that Plaintiff would be able to utilize the mechanical and repair skills obtained from his past relevant work as a mechanic, building maintenance person, and boiler operator. *Id.* These skills will lend themselves well to the use of hand tools. *Id.* He also included, in his consideration, the previously disqualified jobs of truck driver and laborer. *Id.* Due to his inclusion, VE Heckman concluded that Plaintiff would be able to drive trucks and cars, keep driving records, and load specs. *Id.*

VE Heckman stated that Plaintiff would not be able to perform his past relevant work at the medium and heavy levels. *Id.* However, he did seem to indicate with his inclusion of the disqualified truck driver position that Plaintiff would be able to perform in driving occupations that are at the light level such as a light truck driver or route sales delivery driver, (DOT 292.137-014), of which there are approximately 776 jobs locally. *Id.* He also suggested the position of a small engine repair/mechanic of which there are only 14 jobs available locally. *Id.* VE Heckman noted that Plaintiff would be able to perform sedentary, unskilled positions including that of a telephone quotation clerk (218 jobs locally, 68,145 jobs nationally), a product inspector (100 jobs locally, 34,650 jobs nationally), and a ticket checker (144 jobs locally, 45,430 jobs nationally). *Id.*

In the February 13, 2006 interrogatory ("February interrogatory"), VE Heckman commented further on Plaintiff's mechanical and repair skills, stating that these skills would only apply to the equipment Plaintiff had previously used and not all mechanical devices. R. 157. Despite this limitation, VE Heckman postulated that there would be many jobs present that would utilize Plaintiff's skills although he did not give specific numbers. *Id.* VE Heckman did provide other possible occupations at the light level including that of a carburetor mechanic (light, skilled), brake adjustor (light, unskilled), and vehicle systems converter (light, skilled). R. 158. Although VE Heckman listed the small engine repair/mechanic position as light and skilled, it would appear that he later disclaimed this assertion stating that, "[although the DOT clarifies 'small engine repair/mechanic [DOT] 625.281-034', as medium with an SVP [specific vocational preparation] of 6, the above 3 mechanic jobs [carburetor mechanic, brake adjustor, and vehicle systems converter] are all closely related to his PRW [past relevant work] as an automobile mechanic in the automotive service industry designation." *Id.*

    2.    *The ALJ correctly assessed Plaintiff's Residual Functional Capacity.*

The Court now turns to Plaintiff's argument the ALJ's hypothetical to the VE was flawed because the question did not account for all of Plaintiff's functional limitations. The Commissioner contends that the ALJ's RFC determination and the hypothetical question posed was supported by the evidence of record.

At step five of the sequential analysis, the Commissioner is required to show that "other jobs exist in significant numbers in the national economy that the claimant could perform." *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005). The ALJ's determination is largely based on testimony provided by the vocational expert. *Id.* at 553, *citing Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984) (citations omitted). *See also Boone v. Barnhart*, 353 F.3d 203, 205-06 (3d Cir. 2003) ("At the fifth step of the evaluation process, 'the ALJ often seeks advisory testimony from a vocational expert.") "[A] hypothetical question posed to a vocational expert must reflect *all* of a claimant's impairments" meaning that the hypothetical question "posed must 'accurately portray' the claimant's impairments," more specifically, "all of a claimant's *credibly established limitations*." *Rutherford*, 399 F.3d at 554 (emphasis provided) (internal

citations omitted).

While acknowledging Dr. Richless' February 13, 2004 findings which stated that Plaintiff could walk and stand for four hours in an eight-hour day, Plaintiff intimates that Dr. Richless' medical opinion (normal gait and station, no difficulties with weight-bearing or ambulation, no use of any assistive devices, lack of muscle atrophy, decreased sensation to light touch, chronic bilateral foot pain, able to perform a range of light work) might have changed after the follow-up EMG/MCV study and he appears to be suggesting that the ALJ was remiss in not following through. Pl.'s Br. 10. This proposition lacks merit. Indeed, Dr. Richless noted in his follow-up report on April 21, 2005 that although the EMG/MCV studies showed a moderately severe peripheral polyneuropathy (as Richless had hypothesized in February 2004 was a possibility), Plaintiff "has had no significant integral changes in his health since his last examination." R. 176.

Plaintiff also argues that the ALJ erred in not according enough weight to Dr. Marty's opinions regarding Plaintiff's disability. On February 23, 2005, Dr. Marty observed on an Employment Assessment Form that Plaintiff was "permanently disabled" and was unable to engage in any gainful employment. R. 186. On March 15, 2005, Dr. Marty stated that Plaintiff's "feet were disabled." R. 188. On January 31, 2006, Dr. Marty again stated that Plaintiff was disabled due to arthritic changes. R. 197. On February 23, 2006, Dr. Marty opined that Plaintiff was disabled, and further noted on March 9, 2006, that Plaintiff was "incapable of even low stress jobs." R. 191.

Although these medical opinions do deserve to be accorded substantial weight, they are not to be considered especially significant as they are within the realm of matters reserved for the Commissioner. A medical statement or opinion expressed by a treating source on a matter reserved for the Commissioner, such as the claimant is "disabled" or "unable to work," is not dispositive or controlling. *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir.1994) citing *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990) ("this type of [medical] conclusion cannot be controlling. 20 C.F.R. § 404.1527 (1989) indicates that [a] statement by your physician that you are disabled or unable to work does not mean that we will determine that you are disabled. We

12

have to review the medical findings and other evidence that support a physician's statement that you are disabled.") (internal citations omitted).

The ALJ evaluated the medical evidence and found that Dr. Marty's assessment was not supported by the evidence of record and was plagued with inconsistencies, both in his own reports and in correlation to Plaintiff's own testimony. "Under applicable regulations . . . , opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). However, a medical opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record . . ." 20 C.F.R. § 404.1527 (d)(2).

The ALJ noted that in the medical source statement regarding the nature and severity of impairments (R. 191-196), Dr. Marty stated that Plaintiff could not walk a full block before feeling the effects of his symptoms or resting. R. 25, 191, 194. Dr. Marty also stated that Plaintiff could only sit for two hours or more, stand or walk for fifteen minutes before increasing the severity of his symptoms. *Id.* Dr. Marty concluded that Plaintiff must walk every ten to fifteen minutes for three to five minutes at a time. *Id.* The ALJ referred to the lack of evidence in the record explaining such a disparity in the recommendation that Plaintiff walk every ten to fifteen minutes for three to five minutes while experiencing a level of severity that prohibited him from walking a full block before being affected by his symptoms. R. 25.

Furthermore, Dr. Marty's observations differ from Plaintiff's own declarations regarding his capabilities. Initially, Plaintiff stated that he could not stand or walk for more than a few hours, that he could walk on level ground without stopping for one or two miles before his toe became sore, and that he could sit for a few hours before having to move his feet. R. 24, 105, 135. Plaintiff could climb about twenty or thirty steps without stopping to rest. R. 135. He also stated that standing and walking do cause him pain and the pain can last for hours or days and the pain affects his sleeping habits. R. 137. His medications consist of over-the-counter medicines and he does not use nor need an assistive device. R. 138.

13

Plaintiff testified during the hearing that he does use a cane once in a while if his feet get too sore although the cane use is not a prescription. R. 250. He also experiences numbness in his feet which sets in half an hour to an hour after he starts walking. R. 253. He does feel pressure on the bottom of his feet but he estimates that he can stand for about an hour, provided he is able to take the weight off one foot at a time. R. 255-256. Plaintiff stated that he drives about twenty (20) miles during the week. R. 248.

Plaintiff also asserts that as the ALJ found inconsistencies in Dr. Marty's opinion, he had a duty to remedy those inconsistencies by requesting additional information from Dr. Marty. In support of this argument, Plaintiff cites to two district court decisions, *Gauthney v. Shalala*, 890 F. Supp. 401, 410 (E.D. Pa 1995) and *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa 1976). Plaintiff's argument distorts the issues and holdings of the two cited authorities and contradicts controlling regulation dictating when an ALJ should request additional information from a treating source. Both cases involve unrepresented plaintiffs to whom the ALJ failed to give advice regarding the need to submit pertinent medical records relating to evidentiary gaps in the record (*Gauthney*, 890 F.Supp at 410) and to the period of disability at issue (*Saldana*, 421 F. Supp. at 1131-1132). These two cases did not involve a situation in which the ALJ needed to clarify ambiguities before making a determination about disability. Moreover, 20 C.F.R. § 416.912(e)(1) mandates that a treating source will be re-contacted "[w]hen the evidence we receive from your treating physician or psychologist or other medical source *is inadequate for us to determine whether you are disabled*." (Emphasis added). Here, there was sufficient evidence of record to allow the ALJ to make a determination on Plaintiff's disability. The ALJ simply rejected Dr. Marty's opinions as they were not supported by the evidence of record.

Plaintiff highlights Dr. Marty's opinion on February 23, 2006 and argues that the ALJ rejected this opinion because the ALJ found "that the opinion was offered in support of an application for medical coverage that the Plaintiff needed for treatment . . . [but] it is unclear where the ALJ obtained this conclusion [as] there is no evidence of record to support that the February 2006 opinion was given in support of some application for medical coverage." Pl.'s Br. 10. The Court finds this argument baseless as the ALJ was not referring to the February 23,

14

2006 opinion (which was in a medical note recording Plaintiff's visit that day) but rather, to the February 23, 2005 Employment Assessment Form Dr. Marty completed for the PA DPW. R. 185-186. The ALJ stated that the completion of the state welfare form for medical coverage indicated that a "less restrictive definition of disability may have been used as a basis for the conclusion." R. 23. The ALJ was correct in exercising caution in the consideration of the state welfare form as the state's standard for disability differs from the standards applied for social security benefits eligibility. *See* 20 C.F.R. 404.1504 ("A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us"). The Court, therefore, finds that the ALJ's RFC determination was not flawed and does not require reversal.

3. *The ALJ's Reliance On VE Heckman's Testimony Did Not Prove Fatal To The ALJ's Disability Determination.*

In essence, Plaintiff is asking the Court to remand the case based on the inconsistencies generated by one of the two vocational experts. He asserts that the hypothetical questions posed to the vocational experts differed so egregiously as to constitute a reversible error. In tandem with that assertion, he also argues that the ALJ erroneously relied on one of the VE's testimony which included jobs already disqualified as constituting past relevant work and that one of the VE's testimony did not include jobs under the RFC-determined light exertional level. The Commissioner avers that the omission of the four-hour requirement in the hypothetical question posed to VE Heckman and the differing opinions between the vocational experts were minor and did not prove fatal to the ALJ's determination. The Commissioner contends that the fact that both vocational experts opined that Plaintiff could perform light jobs and VE Hoffman's testimony "was based on a hypothetical question that precisely matched the RFC finding of the ALJ in his decision) renders the outcome of this case unchanged. Def.'s Br. 15.

The Court agrees with the Commissioner that both vocational experts did state that Plaintiff was capable of performing work at the light-exertional level. "Light work involves

15

lifting and/or carrying no more than 10 pounds frequently or 20 pounds occasionally, standing and/or walking up to six hours in an eight-hour workday and some pushing and/or pulling of arm or leg controls. To perform a full or wide range of light work, an individual must have the ability to perform substantially all these activities. If an individual can perform light work, . . . they can also perform sedentary work, unless there are additional limiting factors, such as the loss of fine manual dexterity or the inability to sit for long periods of time." R. 22. *See also* 20 C.F.R. § 416.967.

VE Hoffman concluded that Plaintiff would not be able to perform his past relevant medium-exertion level work of auto mechanic/gas station attendant, maintenance person, and boiler operator. R. 260. He did not, as Plaintiff suggests, state that Plaintiff could perform his past relevant work. Pl.'s Br. 4. He did however, state that Plaintiff would still be able to perform in jobs that retained the lighter aspects of his previous jobs such as a cashier in a gas station (100 jobs available locally and 80,000 jobs available nationally). R. 261. He found that Plaintiff would be able to do sedentary jobs including that of surveillance monitor (20 jobs locally, 800 jobs state-wide, 10,000 jobs nationally). R. 263. VE Hoffman also opined that Plaintiff could perform jobs that required the use of hand tools. R. 262.

Likewise, VE Heckman found that Plaintiff could perform jobs that utilized hand tools. R. 151. VE Heckman also stated that Plaintiff would not be able to perform his past relevant work at the medium and heavy levels but he did highlight, in his consideration of the disqualified truck driver position, light driving occupations of which there are approximately 776 jobs locally. R. 152. VE Heckman concluded that Plaintiff would be able to perform sedentary, unskilled positions including that of a product inspector (100 jobs locally, 34,650 jobs nationally). *Id.*

The Court finds that although the Commissioner argues, and the ALJ states, that the testimony and statements of both vocational experts were considered in the determination of Plaintiff's receipt of disability benefits, the ALJ's opinion primarily relies on VE Heckman's findings. R. 26-28. However, the Court does agree with the Commissioner's contention that the omission of the four-hour standing/walking requirement in the hypothetical posed to VE

Heckman and his resulting opinion was minor and did not substantially alter the ALJ's determination.

Plaintiff argues that the ALJ relied on testimony by VE Heckman which "erroneously include[d] jobs which the SSA already determined were not performed for long enough to constitute past relevant work." Pl.'s Br. 6. Past relevant work refers to work that a claimant has performed within the past fifteen years or fifteen years prior to the established date of disability. R. 21. *See also* Social Security Ruling 82-62. When determining a claimant's residual functional capacity, the work not only has to have been performed within the past fifteen years and lasted long enough for the claimant to learn the skills but it must also constitute substantial gainful activity. 20 C.F.R. §§ 404.1520(f), 416.920(f), and 404.1565. The determination of substantial gainful activity is conducted through the evaluation of a claimant's earnings from the work activity. 20 C.F.R. § 404.1574(a)(1). If a claimant is found to have garnered a substantial amount of earnings, that person is considered to have engaged in substantial gainful activity.[5] *Id.* Indeed, VE Heckman did include, in his consideration, the positions of truck driver and laborer, both of which had been previously disqualified. However, these positions were disqualified, not as past relevant work, but as successful work attempts that would be included in the ALJ's consideration of whether Plaintiff had engaged in substantial gainful activity since June 19, 2003. R. 21.[6] Thus, the Court finds that the ALJ's reliance on VE Heckman's testimony did not

---

[5]*See also* 20 C.F.R. § 1574(a)(1) which states,
"The amount of your earnings from work you have done (regardless of whether it is unsheltered or sheltered work) may show that you have engaged in substantial gainful activity. Generally, if you worked for substantial earnings, we will find that you are able to do substantial gainful activity. However, the fact that your earnings were not substantial will not necessarily show that you are not able to do substantial gainful activity. We generally consider work that you are forced to stop or to reduce below the substantial gainful activity level after a short time because of your impairment to be an unsuccessful work attempt. Your earnings from an unsuccessful work attempt will not show that you are able to do substantial gainful activity."

[6] The ALJ stated in his opinion that, "[t]he claimant returned to work for one day in August 2003, one day in October 2003, and less than one month in November 2003. He was unable to continue working because of his disability . . . Whether this work was substantial gainful activity need not be determined because it constitutes an unsuccessful work attempt and

17

prove fatal to the ALJ's disability determination.

## VI. CONCLUSION

For the foregoing reasons, the Court finds that the decision of the ALJ was supported by substantial evidence. Accordingly, the decision of the ALJ will be affirmed. An appropriate order will follow.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc: Joanna P. Papazekos, Esquire
Caroselli, Beachler, McTiernan & Conboy
20 Stanwix Street
Seventh Floor
Pittsburgh, PA 15222

Paul Kovac, Esquire
Assistant United States Attorney

---

must, therefore, be disregarded on that basis alone. No other work activity is alleged after June 19, 2003. The Administrative Law Judge finds that the claimant has not engaged in disqualifying substantial gainful activity since June 19, 2003." R. 21.